FILED

2005 Feb-01  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOYCE SHARPLEY, Wife of Decedent As Administratrix of the Estate of Decedent, JAMES EDWARD SHARPLEY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-02-JHH-0235-NE** |
| | ) | |
| **JOHN RALEY, individually; TIM COSBY, individually; and JOHNNY JOHNSON, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF DECISION AND ORDER

The court has before it plaintiff's September 14, 2004 motion for summary

judgment as to the liability of defendant Cosby.  Under the September 15, 2004

order, the motion came under submission October 13, 2004.  The court also has

before it defendant Cosby's October 13, 2004 motion for summary judgment.

Under the October 14, 2004 order, this motion came under submission on

November 12, 2004.  On November 12, 2004, defendant Johnson also moved the

court for summary judgment.  Johnson's motion came under submission on

December 14, 2004.  Although also under submission, at this time the court is not

considering the merits of plaintiff's motion for summary judgment as to defendant

Raley or Raley's cross-motion for summary judgment.

## I. Procedural History

Plaintiff Joyce Sharpley, the surviving spouse and administratrix of the

estate of Edward Sharpley ("Sharpley"), commenced this action on January 30,

2002 seeking damages relating to Sharpley's death, which was caused by

defendant John Raley ("Raley"). The claims remaining in this lawsuit are against

Raley, Tim Cosby ("Cosby") and Johnny Johnson ("Johnson") in their individual

capacities.[1] The claims against Cosby and Johnson relate to their capacity as

Raley's supervisor. Raley filed his answer on November 13, 2002. Cosby and

Johnson filed their answers on November 18, 2002.

All parties have filed briefs and submitted evidence in support of their

respective positions. Plaintiff submitted evidence[2] in support of her motion for

summary judgment and filed a supporting brief on September 14, 2004. Cosby

---

[1] See orders entered October 21, 2002 and November 19, 2002.

[2] Plaintiff submitted: grand jury testimony of John Raley from State v. Raley, CC-01-1018 (Limestone Circuit Court) (herinafter "state criminal trial"); reading of grand jury's indictment of John Raley from state criminal trial; testimony of John Raley from state criminal trial; testimony of Tim Cosby from state criminal trial; deposition of John Raley; order affirming conviction - Raley v. State, Ms. 020983 (Ala. Crim. App. 2003) (unpublished); certificate of judgment, denial of writ of certiorari - Ex parte Raley, Ms. 1030018 (Ala. 2003) (unpublished); oral jury charge from state criminal trial; jury verdict from state criminal trial; sentencing from state criminal trial.

2

submitted evidence[3] in support of his motion for summary judgment on October 6,

2004 and filed a supporting brief on October 13, 2004. Plaintiff again submitted

evidence[4] on November 4, 2004 and filed a response brief to Cosby's motion on

November 12, 2004. Plaintiff also submitted a box of exhibits[5] to the court on

November 18, 2004.

---

[3] Defendant Cosby submitted: John Raley's application for examination; letter from James D. Martin to John Raley; affidavit of James Jackson with attached exhibit;Supervisor's Orientation Check Sheet for John Raley; Procedural General Order Number 1 of the Division of Game and Fishery; documents relating to Game and Fish Division's Advanced New Officer Training Program; documents relating to John Raley's continuing education credits; letter from Cosby to Ken Hallford; state criminal trial testimony excerpts of Cosby; deposition excerpts of John Raley; vita of Ronald Kiker; and the opinion of Ronald Kiker.

[4] Plaintiff submitted: deposition of Tim Cosby with attached exhibits; deposition of Johnny Johnson with attached exhibits; deposition of Ronald Kiker with attached exhibits; deposition of Brian Wagar; deposition of Timothy Cadman; and affidavit of George Grissom.

[5] Plaintiff submitted: letter from James Jackson to Sheriff McDowell; plaintiff's re-notice of deposition to John Raley; personnel file of John Raley; Supervisor's Orientation Check Sheet for John Raley; procedural general orders and policies of the Alabama Game and Fish Division; Alabama Game and Fish Division documents; state criminal trial testimony of John Raley; grand jury testimony of John Raley; plaintiff's supplemental interrogatories and request for production of documents to John Raley with responses; John Raley's prescription list; John Raley's medical records; vita of Ronald Kiker; materials reviewed by Ronald Kiker; state criminal trial testimony of Delanie Cottingham and Tim Cadman; statement of William Bryant; article by Thomas Petroski; information taken from deposition of Tim Cosby; plaintiff's re-notice of deposition of Tim Cosby; employee performance appraisal forms; John Raley's phone records; plaintiff's supplemental interrogatory and request for production of documents to Cosby and Johnson with responses; Johhny Johnson's employee performance appraisal; plaintiff's first interrogatories to Johnny Johnson with answers; state criminal trial testimony of Cosby; Cosby's answers to plaintiff's first interrogatories; appellate transcript; exhibits from state criminal trial; Alabama certificate of death; photographs of the accident scene; and exhibits attached to previously filed motions.

3

Defendant Johnson submitted evidence[6] in support of his motion on

November 23, 2004 and a supporting brief on November 30, 2004.  Plaintiff filed

a brief in opposition to Johnson's motion on December 13, 2004.  On December

20, 2004, Johnson filed a short reply brief.

## II. Standards for Evaluating a Summary Judgment Motion

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion and identifying

those portions of the pleadings or filings which it believes demonstrate the

absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323.  Once

the moving party has met his burden, Rule 56(e) requires the nonmoving party to

go beyond the pleadings and by his own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that

---

[6] Defendant Johnson submitted: affidavit of Johnny Johnson; deposition of Johnny
Johnson; and the evidentiary submissions of Cosby and plaintiff.

4

there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-

5

moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the

6

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency. However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[7]

During the afternoon of July 6, 2001, Alabama state conservation officer

(also referred to as "game warden") John Raley ordered a car driven by James

Edward Sharpley to pull over pursuant to a traffic stop.[8] (See Raley Depo at 165-

---

[7] If the facts are in dispute, they are stated in the manner most favorable to the non-moving party. See Fitzpatrick, 2 F.3d at 1115. In the case sub judice there are cross-motions for summary judgment, nevertheless, each side must still establish the lack of a genuine issues of material fact and that it is entitled to judgment as a matter of law. See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (Former 5th Cir. 1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

Testimony taken from the certified state criminal trial transcript is properly before the court on summary judgment and has been included in the voluminous evidentiary submissions of each party without objection. The court takes judicial notice of the prior proceedings against Raley in the state court system. The court additionally notes that the prior testimony is presented to this court in the form of the "Reporter's Official Transcript on Appeal." This transcript was certified by the Official Court Reporter on February 14, 2003.

[8] Traffic stops are not an official duty of a conservation enforcement officer although it is within their official authority. (See Johnson Depo. at 37.)

7

66.) After Raley and Sharpley's vehicles stopped, Sharpley exited his vehicle onto the shoulder of interstate I-565. (See id. at 168.) Within a matter of seconds, Sharpley got back into his car and told his passenger, Brian Wagar, "it's not a ... cop."[9] (See Wagar Trial Testimony at 61) (expletive omitted).

Sharpley drove to a nearby RaceTrac gas station, still being pursued by Raley who had engaged the siren and blue lights on his marked game warden truck. (See Raley Depo. at 171.) Sharpley parked his car at a gas pump and exited his vehicle. (See id. at 173.) Sharpley met Raley near the game warden truck. (See id. at 174.) Sharpley was summoned to come towards Raley's truck and he did so with his hands in the air as if he did not understand something. (See Cadman Depo. at 18.) Raley touched Sharpley on the shoulder and twice ordered Sharpley to put his hands on the truck's hood. (See Raley Depo. at 174.) Sharpley was aggravated and told Raley "don't touch my clothes." (See Raley Depo at 177; Cadman Trial Testimony at 71, Bryant Trial Testimony at 445.) Raley then requested Sharpley's driver's license, whereby Sharpley responded "I will give you something and call it a driver's license." (See Raley Depo. at 177.) Raley placed his hand on his holstered pistol and followed Sharpley back to his vehicle.

---

[9] Wagar and Sharpley were carpooling home from a job site. (See Wagar Trial Testimony at 61.)

8

(See Raley Depo. 177-78, 180; Bryant Trial Testimony at 456, 467.) Sharpley's

door was left open, and Sharpley leaned into his car to fumble with items in the

console area. (See Raley Depo. at 182-83.) At this point, Raley was standing a

few feet behind Sharpley. (See Raley Depo. at 181-82.)

Raley became concerned that Sharpley had grabbed a gun so Raley removed

his pistol from the holster on his belt, which was adjacent to a canister of mace.[10]

(See Raley Depo. at 185.) Raley did not warn Sharpley that he was behind

Sharpley or that he removed his pistol. (See Raley Trial Testimony at 552.)

Sharpley picked up something and began to turn back towards Raley. (See Raley

Depo. at 185-86.) At this point, Raley pointed his pistol, stepped back and fired,

striking Sharpley in the armpit area. (See Raley Depo. at 186, 203.)

Raley then aimed his pistol at Wagar and ordered him to put his hands on

the dashboard. (See Raley Depo. at 205.) Raley then asked Wagar if Sharpley had

a gun. (See Raley Depo at 205.) Wagar answered that "there ain't no gun." (See

Raley Depo. at 205.) Raley then checked Sharpley and determined that he was

breathing and had a pulse. (See Raley Depo. at 205.) Raley called Johnson and

informed him that he was involved in a shooting, and approximately one minute

later, Raley again called Johnson to request emergency assistance. (See Johnson

---

[10] The court notes that the following events elapsed in a very short period of time.

9

Depo. at 84-86.) Raley and a nurse, who was coincidentally at the gas station, performed cardiopulmonary resuscitation ("C.P.R.") on Sharpley. (See Raley Grand Jury Testimony at 19; Cunningham Trial Testimony at 212-13.) A search revealed that there was no gun on Sharpley's person, in his vehicle or on in the possession of his passenger. Instead, it was determined that Sharpley had grabbed his driver's license which had fallen under Sharpley's body. (See Raley Testimony at 554.) The bullet entered Sharpley's back at the right armpit and pierced his lung, liver and heart. See Raley v. State, Ms. 020983, at *4 (Ala. Crim. App. 2003). Sharpley died a few minutes later. (See id.)

These events prompted the State of Alabama to successfully prosecute Raley in the Circuit Court of Limestone County, Alabama. See State v. Raley, CC-01-118 (2002). On October 18, 2002, the jury in the state court criminal proceeding found Raley guilty of manslaughter.[11] The trial court charged the jury on the theory of self-defense as well as legal provocation. See Raley v. State, Ms. 020983, at *4 (Ala. Crim. App. 2003). Raley received a ten year suspended

---

[11] ALA. CODE § 13A-6-3 provides:

(a) A person commits the crime of manslaughter if:

...

(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.

10

sentence and two years of probation. The Alabama Court of Criminal Appeals affirmed the conviction in Raley v. State, Ms. 020983 (Ala. Crim. App. 2003) (unpublished). The Alabama Supreme Court denied certiorari on December 13, 2003. See Ex parte Raley, Ms. 1030018 (Ala. 2003).

In addition to the claims against Raley, Plaintiff has also asserted claims against Cosby and Johnson in their supervisory capacity. During the time in question, Johnson was a district supervisor, which in essence meant that he was Raley's "direct" supervisor. (See Johnson Aff. at 3; Cosby Depo. at 39.) (Johnson supervised two lieutenants, who in turn, supervised the game wardens in a thirteen county area, (See Johnson Aff. at 2-3.)) Cosby was chief enforcement officer and head of the law enforcement section at the time of the shooting. (See Johnson Depo. at 38, 163.) As chief enforcement officer, Cosby was Johnson's direct supervisor. (See id.) Cosby would have been responsible for disciplining Raley in the event it was necessary. (See Cosby Trial Testimony at 471-72.) Raley was not reprimanded by his supervisors for the events of July 6, 2001. (See Johnson Aff. at 153-54.) In fact, at the state court criminal trial, Cosby testified:

> Q:    Did you find [Raley's] actions, after that review, to be in accordance with your standard operating procedures?
>
> A.    Yes sir. As best we could determine.

11

(See Cosby Trial Testimony at 473-74.) Raley's evaluations for the period of June
1, 2001 until June 1, 2002 (which include the shooting) indicate that Raley's work
exceeded the expectations of his supervisors. (See Johnson Depo, Ex. 23.)

The procedures Raley was deemed not to have violated were promulgated
by the director of the Game and Fish Division, Charles Kelley, with the approval
of the commissioner, and Cosby personally went over the PGO's with every new
officer. (See Johnson Aff. at 3.) On August 20, 1996, Raley signed several
memoranda from Charles Kelley acknowledging that he understood various
Procedural General Orders. (See Cosby Submission, Ex. 5.) Procedural General
Order Number 2 established the procedures for game warden's use of force:

I.  Use of Force

A.  An officer may use force *only* when he/she believes no reasonable
    alternative to force exists.
B.  Officers may use *only* that force necessary to perform their duties
    and prevent harm to themselves or others.
C.  Officers who are met with force while carrying out a lawful order
    or directive, effecting an arrest, or protecting property shall use
    only that amount of force necessary to perform their duties and
    defend themselves or others from harm.

(See id.) (emphasis as appears in original). Procedural General Order Number 3
established the procedures for game warden's use of deadly force:

I.  Use of Deadly Force

12

A. Officers shall not fire their weapon to kill, but rather to stop and incapacitate an assailant from completing a potentially deadly act as described in thefollowing sections of this Policy. For maximum stopping effectiveness and a minimal danger to innocent bystanders, the offiicer should shoot at "center body mass" whenever possbible.

B. Officers may use deadly force to protect themselves or other when they have reasonable cause to believe the use of force is necessary to prevent imminent or at least a substantial likelihood of death or grave bodily harm to themselves or others.

C. Officers may use deadly force to effect the capture of or prevent the escape of a suspect who the officer reasonably believes has committed a felony involving the use of deadly force *and* the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

...

II.  Discharge of Firearm

...

E. Except for general maintenance, storage, or authorized training, officers shall not draw or exhibit their firearm unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon in conformance with other sections of this policy.

(See id.) (emphasis as appears in original).   Procedural General Order Number 6

established the procedures for game warden's carrying of firearms:

V.  Maintaining Proficiency with Authorized Firearms

In order to establish uniform guidelines for maintaining proficiency:
A.  Semiannual firearms training will be required for all sworn personnel.
B.  All sworn personnel must qualify with a score of 70. ...

13

C.  If an officer fails to qualify after three attempts, the officer will be reassigned to non-enforcement duties ....

(See id.)

As mentioned above, on January 30, 2002, plaintiff initiated a civil lawsuit in this court stemming from Sharpley's death under both state and federal law. Plaintiff seeks relief for wrongful death under ALA. CODE § 6-5-410 (Count I) and for alleged constitutional violations under 42 U.S.C. § 1983 (Count II).

## IV. Applicable Substantive Law and Analysis

### 1.  Plaintiff's 42 U.S.C. § 1983 Claim Against Cosby and Johnson

Plaintiff's complaint alleges that Cosby and Johnson violated Sharpley's constitutional rights by inadequately training, supervising and disciplining Raley as well as by adopting policies and/or customs which encouraged and accepted the alleged violations of the laws of the United States. Cosby and Johnson assert qualified immunity. Government officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The parties have not contested that Cosby and Johnson were acting in their discretionary authority as public officials at all times relevant to this case. Accordingly, the issue before

14

the court is whether Cosby and Johnson's conduct violated clearly established statutory or constitutional rights.

The Supreme Court has stated that "[a] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603 (1999). Therefore, as this court has been instructed, the first inquiry is whether the facts, viewed in the light most favorable to plaintiff, establish that Cosby or Johnson's actions deprived Sharpley of any statutory or constitutional rights.

Supervisor liability runs against individuals for their own personal responsibility for a constitutional violation. As is true with a local government defendant, a supervisor cannot be held liable under § 1983 on a respondeat superior basis. See Monell v. Dept. of Soc. Serv., 436 U.S. 658, 694 n. 58 (1978); see also Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994); Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). At the same time, a supervisor may be liable even where he is not directly involved in the constitutional violation. See Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987) (holding that supervisor liability is "imposed against the supervisory official in his individual capacity for

15

his own culpable action or inaction in the training, supervision or control of his

subordinates"). The misconduct of the subordinate must be "affirmatively

link[ed]" to the action or inaction of the supervisor." See Rizzo v. Goode, 423

U.S. 362, 371 (1976) (before Monell). The Eleventh Circuit articulated the

following in Brown:

> Supervisory liability [under § 1983] occurs either when the supervisor
> personally participates in the alleged constitutional violation or when
> there is a causal connection between actions of the supervising
> official and the alleged constitutional deprivation. The causal
> connection can be established when a history of widespread abuse
> puts the responsible supervisor on notice of the need to correct the
> alleged deprivation, and he fails to do so. The deprivations that
> constitute widespread abuse sufficient to notify the supervising
> official must be obvious, flagrant, rampant, and of continued
> duration, rather than isolated occurrences.[12]

Brown, 906 F.2d at 671 (citations omitted). The standard a plaintiff must meet to

require supervisor liability is "*extremely rigorous*." Braddy v. Fla. Dep't of Labor

& Empl. Sec., 133 F.3d 797, 802 (11th Cir. 1998) (emphasis added), and there

must be more than mere negligence to sustain a § 1983 action against a supervisor.

See Daniels v. Williams, 474 U.S. 327, 330, 333 (1986) (merely negligent conduct

---

[12] Two recent Eleventh Circuit opinions make clear the four bases of imposing supervisor
liability are when the supervisor: (1) personally participated in alleged constitutional violation, or
(2) was on notice of a need to correct widespread abuse yet failed to do so, or (3) was responsible
for improper custom or policy resulting in deliberate indifference or (4) directed subordinates to
act unconstitutionally or knew that they would act unconstitutionally and failed to stop them from
doing so. See Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003); Dalrymple v. Reno, 334 F.3d
991, 995-96 (11th Cir. 2003) (Bivens claim).

by a state official is insufficient to state a due process claim under § 1983). In fact, the Eleventh Circuit, borrowing from Supreme Court precedent, stated that the pertinent inquiry is whether the supervisor was "deliberately indifferent" in supervising subordinates, and if so, whether that deliberate indifference actually caused the deprivation of plaintiff's federal rights. See Greason v. Kemp, 891 F.2d 837, 840 (11th Cir. 1990).

## A.    Failure to Correct Widespread Abuses

The court first notes that Cosby and Johnson did not participate in Sharpley's death. Thus, the first issue is whether any issue of material fact exists as to whether Cosby or Johnson were aware of a history of widespread violations by Raley to put them on notice that he would violate Sharpley's rights.[13] As discussed above, the Eleventh Circuit in Brown stated that only "widespread abuse" constituting of "obvious, flagrant, rampant and of continued duration" would be sufficient to notify Cosby or Johnson. Moreover, the Clark v. Evans court stated, "it is clear that four cases in four years would have been insufficient to put [the supervisor] on notice ..." 840 F.2d 876, 885 (11th Cir. 1988). In the case sub judice, no evidence indicates that Cosby or Johnson had reason to suspect

---

[13] The court notes that the question of whether Raley's conduct did in fact comport with Fourth Amendment standards will be addressed when the court adjudicates the summary judgment motions regarding the claim against Raley.

17

Raley would "jump the gun" in those circumstances. In fact, Raley's evaluations

demonstrate a respectable, incident free history of service. The only evidence the

court could find that calls this fact into question is George Grissom's affidavit

stating that he notified both Cosby and Johnson of occasions where Raley

allegedly would "harass, threaten, and/or exhibit other wrongful conduct." (See

Grissom Aff. at ¶ 5.) Although Grissom's statements are disputed,[14] even taking

Grissom's statement as true, which would be viewing it in the light most favorable

to plaintiff, an isolated complaint of threats and/or violence is not enough to

satisfy the "extremely rigorous" standard in this circuit. Grissom does not give

any specificity about how many times he talked with Cosby or Johnson. See Otey

v. Marshall, 121 F.3d 1150, 1156 (8th Cir. 1997) (addressing a similar affidavit

and holding that "[a]ssuming that these violations are true, we conclude that they

fail to state a violation by [the supervisor].... [T]he affidavit does not state when

excessive force was allegedly used, what the excessive force consisted of, nor

when the complaints of excessive force were allegedly made."). Moreover, to the

extent the court can discern the precise nature of the complaints against Raley,

Grissom's complaints do not establish widespread violations. Raley's

---

[14] This testimony is disputed in that Johnson denies ever being notified by Grissom of
Raley's alleged misconduct. (See Johnson Aff. At 2; Cosby Depo. at 66.)

18

employment file is void of any suggestion he has engaged in a pattern of excessive force. Thus, the evidence can not support a finding of supervisor liability on this basis.

## B.    *Deliberately Indifferent Training and Discipline*

Plaintiff also argues that Cosby and Johnson furthered policies that showed deliberate indifference to Sharpley's rights and acquiesced to a custom permitting the use of excessive force on an unarmed arrestees. Tim Cosby occupied the position of Chief of Enforcement of the Alabama Division of Wildlife and Freshwater Fisheries at the time of Sharpley's death. Plaintiff's claim against Cosby focuses on alleged failures to discipline Raley after the shooting and to train Raley on how to conduct traffic stops. Johnny Johnson was Conservation Captain for the Alabama Division of Wildlife and Freshwater Fisheries at the time of Sharpley's death. Plaintiff's claims against Johnson relate to approval of evaluations stating that Raley "Exceeds Standards" even after the shooting. In addition, plaintiff argues that neither of these defendants ensured that Raley was certified by the Alabama Peace Officers Standards and Training Commission ("APOST").

For plaintiff to establish liability on the basis of inadequate training, she must show: (1) a deliberately indifferent policy of training that was (2) the

19

proximate cause of the violation of the plaintiff's federally protected rights. City of Canton v. Harris, 489 U.S. 378 (1989); see also Greason, 891 F.2d at 837 (using the City of Canton analysis to determine supervisor liability). Two situations where training deficiencies could be said to result from deliberate indifference are (1) where there is an obvious need for training and (2) where there is a pattern of constitutional violations by police officers that is so stark "that the need for further training must have been plainly obvious to the city policy makers who, nevertheless, [were] 'deliberately indifferent' to the need." City of Canton at 390, 390 n.10. In either situation, there must be a "high degree of fault" before imposing liability under a failure to train theory. Id. at 396 (O'Connor, J., concurring).

While this standard is difficult for a plaintiff to meet and is only available in "limited circumstances," Id. at 387, the Eleventh Circuit has imposed liability for inadequate training on a number of occasions. One example is Vineyard v. County of Murray, 990 F.2d 1207, 1212 (11th Cir. 1993), where the court agreed with a jury's finding that Murray County had inadequate policies of training. Specifically, the court found that the sheriff's department had inadequate procedures for handling complaints against police officers. Vinyard, 990 F.2d at 1212. The court also found that the record supported the conclusion that this

20

deliberate indifference was the cause of the violation of the plaintiff's

constitutionally protected right. Id. at 1213. Moreover, Hurst v. Finley, 857

F.Supp. 1517, 1523 (M.D. Ala. 1994), aff'd, 63 F.3d 1172 (11th Cir. 1995) found

sufficient evidence from which a jury could impose liability based on deliberately

indifferent training regarding arrests of individuals driving under the influence of

alcohol. The court held that the city did not have a policy requiring administration

of a field sobriety test before the arrest and the absence of the policy caused the

alleged violation of the suspect's right that probable cause support his arrest.

Hurst, 857 F.Supp. at 1523.

Having said that, this court finds that the evidence in this case could not

lead a reasonable jury to conclude that Raley's supervisors demonstrated

deliberate indifference in his training, as is typical in the vast majority of cases

involving claims of inadequate training. There was a series of procedural general

order in place regarding the use of force by game wardens. Cosby was responsible

for going over the orders with each new game warden. As such, Cosby personally

informed Raley that he was required to maintain proficiency with firearms and

only use a weapon in situations which the orders permitted. It appears that the

orders were promulgated with the goal of allowing the use of force pursuant to the

Fourth Amendment reasonableness standard. On several occasions in plaintiff's

21

brief she points to Raley's prior testimony that additional training "would not have hurt." Plaintiff argues that Raley's opinion "confirms" that the instruction was deficient. This argument fails as a matter of law because Raley's supervisor's must act with deliberate indifference in failing to train, not simply failing to provide training that Raley believed "would not have hurt."[15] Furthermore, the procedural general orders gave specific guidance for using force. Sharpley's death was not a result of a faulty traffic stop, but instead, Sharpley was killed as a result of the use of force. The rules governing game warden's use of force were applicable whether Raley was issuing a citation for hunting without a license, or as in this case, conducting a traffic stop. Therefore, the court is unable to find that any evidence could support the finding of deliberately indifferent training.

The City of Canton analysis employed above for failure to train logically extends to plaintiff's related claims of deficient discipline. See Vineyard, 990 F.2d at 1212. While the training claim related to the written procedural general orders governing the conduct of game wardens, the failure to discipline claim is

---

[15] "The need for more or better training alone, sufficient to have avoided the alleged injury, does not trigger § 1983 liability, because of the risk that '[s]uch a claim could be made about almost any [police] encounter resulting in injury.'" Comfort v. Town of Pittsfield, 924 F.Supp 1219, 1233 (D. Me. 1996) (involving a supervisor who encouraged aggressive arrests and implicitly indicated that violations would be tolerated) (quoting City of Canton, 489 U.S. 391 (1989). Even a complete lack of training is not per se unconstitutional. See Rodriques v. Furtado, 950 F.2d 805, 813 (1st Cir. 1991).

22

embodied in an allegedly deficient practice or custom. The general rule in this area is that when a subordinate employee engages in an isolated illegal incident, a supervisory official's failure to discipline that employee is not a de facto acquiescence or encouragement of the wrongful conduct. See McLaughlin v. City of LaGrange, 662 F.2d 1385, 1388 (11th Cir. 1981). However, if there is a pattern of constitutionally offensive conduct by subordinates, of which supervisory officials have or should have knowledge, and which they fail to correct, it may be proper to infer an official policy of acquiescence. See Brooks v. Sheib, 813 F.2d 1191, 1193 (11th Cir. 1987) (described as "tacitly authoriz[ing] these actions"). As is discussed above, there were not multiple violations by Raley. Plaintiff argues that because Raley's supervisors did not reprimand him immediately after the Sharpley incident, this reflects a faulty policy as well as an acquiescence. The choice not to discipline Raley for this isolated incident cannot establish a policy of acquiescence. This is particularly true when the supervisors had good faith reasons not to immediately pursue discipline. It is beyond question that Cosby, Johnson, or the department did not have a formal policy endorsing excessive force. Hence, plaintiff "must establish a widespread practice, that although not authorized by ... express policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Griffin v. City of Opa-Locka, 261 F.3d

23

1295, 1308 (11th Cir. 2001) (internal citation and quotation marks omitted).

Cosby and Johnson could not have been aware of widespread abuses, which would

be required in order to tacitly approve of them, because there is no evidence that

widespread abuses ever existed.

Both parties extensively cite testimony of Cosby and Johnson in support of

their argument regarding the review of Raley's actions. At the state criminal trial,

Cosby testified:

> Q:    Did you find [Raley's] actions, after that review, to be in
>       accordance with your standard operating procedures?
> A:    Yes, sir. As best we could determine.

(See Cosby Trial Testimony at 473-74.)

> Q:    ... you turned the investigation over to the ABI?
> A:    Yes, Sir.
>
> ...
> Q:    You are an internal review of your own officers?
> A:    That is correct.
>
> Q:    And ... you did a limited review and talked a little bit to Mr.
>       Raley? Is that what you said?
> A:    That's correct. I did not want to do anything to jeopardize the
>       investigation that was ongoing.

(See id. at 475.) Johnson testified at his deposition:

> Q:    Tell me about a midappraisal. What is a midappraisal
>       conducted for?
> A:    It's conducted in the middle of the appraisal period. If there's
>       anything wrong or right, you can advise the officer where he

24

can correct it before the end of the appraisal period.

...

Q:  Under middappraisal, the first category states to describe
    employee's performance strengths as observed during the first
    half of the appraisal period. Is that your writing?
A:  Yes, sir.

Q:  You wrote, "Excellent Professionalism, willingness to
    investigate all complaints."
A:  Yes, sir.

Q:  What information did you know of to make that statement?
A:  Well, I know in talking with John Raley he's a very
    professional officer answering questions and that type thing.
    He looks sharp. And as far as willingness to investigate all
    complaints, any complaint I had given to John, he had
    answered it.

...

Q:  And the next area under midappraisal states, "Describe areas of
    employee's performance that need improvement as observed
    during the first half of the appraisal period." Did you write
    N/A?
A:  Yes.

Q:  What factors did you look at in determining that that did not
    apply to John Raley?
A:  Well, I didn't see anything that he needed improving in.

Q:  Well, you knew he had shot and killed an unarmed man.
A:  Yes, sir.

Q:  You didn't think that might be something that needed
    improvement?
A:  John Raley hadn't been convicted of anything.

Q:  Is that what you go by in filling these out, whether or not
    someone has been convicted of a felony.
A:  In my opinion, he hadn't done anything wrong.

(See Johnson Depo. at 150-53). This testimony does not reveal improprieties by Cosby or Johnson. Cosby was directed by the ABI not to investigate the shooting incident as the investigation related to the state criminal case was ongoing. (See Cosby Aff. at 5.) Accordingly, Cosby was not in a position to discipline Raley because he did not investigate the incident, and even if he had been fully informed, it was a close call whether Raley acted in self-defense and/or under provocation. Likewise, Johnson's positive opinion of Raley after Raley killed Sharpley is not entirely surprising considering that Raley was presumed "innocent until proven guilty," and although he was convicted, the jury found that Raley was reasonable in having his passion invoked. In fact, as far as Johnson could tell, the jury was going to find that Raley acted in self-defense, which would have exonerated Raley and confirmed Johnson's opinion. The evaluation merely represents Johnson's opinion that Raley's use of force comported with the Fourth Amendment, which was understandable considering the information at his disposal at the time he issued the evaluation. The day Raley was convicted of manslaughter, his apparent authority to act as a game warden was terminated. (See Raley Depo. at 46.) Had the supervisors kept Raley on after the conviction this case may be different. However, viewing the evidence of this case as a whole in the light most favorable to plaintiff, no reasonable jury could find that Cosby

26

and Johnson were deliberately indifferent in their decision not to discipline Raley or that their actions were a tacit endorsement of excessive force.[16]

Finally, plaintiff argues that Cosby and Johnson allowed Raley to act as a game warden without being APOST certified. It is undisputed that Raley was required to be APOST certified in order to serve as a game warden. Moreover, Cosby testified that he did not check to see if any game wardens under his command were APOST certified. On October 7, 1981, James Jackson, Executive Secretary of APOST, wrote a letter to Sheriff Roy McDowell informing him that an APOST waiver was granted for John Raley. The letter also stated that "Mr. Raley's [waiver] is RESTRICTED to employment with The Etowah County Sheriff's Department ONLY." (See Jackson letter at 1.) (emphasis as it appears in original). The parties make much ado about Raley's certification although the failure is not legally operative under the deliberate indifference standard. It is unquestionable that Raley had enough training to receive a waiver in Etowah

---

[16] The court could also infer deliberate indifference to Sharpley's rights if there were evidence, for example, of repeated failures to log citizen complaints, that a law enforcement agency was deliberately indifferent to a citizen's rights. See Thomas v. Roberts, 261 F.3d 1160, 1176 (11th Cir. 2001). Keeping a record of complaints allows officials to determine whether a "particular officer may have a problem that could be corrected through reassignment, discipline or training." Thomas, 261 F.3d at 1176 (internal citation and quotation mark omitted). As was ultimately true in Thomas, the court cannot infer deliberate indifference under these facts. While George Grissom did make complaints about Raley that were apparently not recorded, his complaints were sparse and isolated. There simply must be more for the court to be able to infer the stringent deliberate indifference standard.

27

County, and presumably, he was qualified to receive the same waiver for his service as a game warden. Cosby also ensured that Raley fulfilled his APOST annual continuing education obligations.[17] Raley was deficient because he did not possess a document stating he was certified for his current line of work. While the court agrees that certification is important and that one of Raley's supervisors should have ensured proper certification, plaintiff's argument ignores the fact that Raley was qualified to work as a peace officer. This is not a case where Cosby or Johnson allowed a layperson to effectuate arrests with a weapon. Instead, this case involves a career peace officer who, for whatever reason, was not in fact APOST certified for his game warden job. Moreover, Raley's lack of certification in Limestone County did not cause any of the alleged deprivations that Sharpley's estate has claimed. Cosby and/or Johnson's failure to ensure that Raley was properly certified was probably negligent, and thus, no issue of material fact exists to suggest their omission was deliberately indifferent.

## C.   *Qualified Immunity*

As the court has found that the evidence cannot establish that Cosby and Johnson have committed an underlying constitutional violation, plaintiff's attempts to invoke § 1983 supervisor liability are without merit. In <u>Hartley v.</u>

---

[17] The annual training included "shoot-don't shoot" scenarios. (<u>See</u> Cosby Aff. at 4-5.)

28

Parnell, the Eleventh Circuit directed that the proper grounds for summary

judgment is the doctrine of qualified immunity in an individual capacity public

official lawsuit when there is no constitutional violation. 193 F.3d 1263, 1270-71

(11th Cir. 1999) (finding inter alia that the merits of the claim of a constitutional

violation are "part and parcel" to the qualified immunity question). Qualified

immunity is a protection designed to allow government officials to avoid the

expense and disruption of trial. See Ansley v. Heinrich, 925 F.2d 1339, 1345 (11th

Cir.1991). Therefore, Cosby and Johnson are entitled to qualified immunity on

plaintiff's § 1983 claim against them at this juncture.[18]

### 2.   Plaintiff's Wrongful Death Claim Against Cosby and Johnson

Plaintiff has also asserted a state wrongful death claim against Cosby and

Johnson under ALA. CODE § 6-5-410. Cosby and Johnson argue that they are

---

[18] Even assuming arguendo that the evidence could show that Cosby and Johnson violated Sharpley's constitutional rights by failing to adequately train, supervise and/or discipline Raley and allowing him to work without proper certification, both individuals would likely be entitled to qualified immunity. The law of this circuit is well-established that the complaint must allege a violation of a clearly established constitutional right. Plaintiff has to "point[] to case law which predates the official's alleged improper conduct, involv[ing] materially similar facts and truly compels the conclusion that the plaintiff had a right under federal law." See Santamorena v. Geogria Military College, 147 F.3d 1337, 1340 (11th Cir. 1998). The case need not be identical but merely materially similar. Id. at 1339. "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Lassiter v. Alabama A& M Univ. Bd. of Trustees, 28 F.3d 1146, 1150 (11th Cir. 1994). It is entirely possible that the court would decide, as did the Hardy v. Town of Hayneville court, that "deliberate indifference determinations, unlike questions of excessive use of force, have not been so clearly defined so as to be obviously applicable without case law with substantially similar facts." 50 F.Supp.2d 1176, 1190 (M.D. Ala. 1999) (internal quotation omitted).

29

immune from this claim pursuant to state-agent immunity as established by a

plurality in Ex parte Cranman, 792, So. 2d 392 (Ala. 2000) and formally adopted

in Ex parte Butts, 775 So.2d 173, 177 -78 (Ala. 2000):

> A State agent shall be immune from civil liability in his or her
> personal capacity when the conduct made the basis of the claim
> against the agent is based upon the agent's
>> (1) formulating plans, policies, or designs; or
>> (2) exercising his or her judgment in the administration of a
>> department or agency of government, including, but not
>> limited to, examples such as:
>>> (a) making administrative adjudications;
>>> (b) allocating resources;
>>> (c) negotiating contracts;
>>> (d) hiring, firing, transferring, assigning, or supervising
>>> personnel;
>
>> or
>
>> (3) discharging duties imposed on a department or agency by
>> statute, rule, or regulation, insofar as the statute, rule, or
>> regulation prescribes the manner for performing the duties
>> and the State agent performs the duties in that manner; or
>> (4) exercising judgment in the enforcement of the criminal laws
>> of the State, including, but not limited to, law-enforcement
>> officers' arresting or attempting to arrest persons; or
>> (5) exercising judgment in the discharge of duties imposed by
>> statute, rule, or regulation in releasing prisoners, counseling
>> or releasing persons of unsound mind, or educating
>> students.
>
> Notwithstanding anything to the contrary in the foregoing statement
> of the rule, a State agent shall not be immune from civil liability in his
> or her personal capacity
>> (1) when the Constitution or laws of the United States, or the
>> Constitution of this State, or laws, rules, or regulations of
>> this State enacted or promulgated for the purpose of

> regulating the activities of a governmental agency require
> otherwise; or
> (2) when the State agent acts willfully, maliciously,
> fraudulently, in bad faith, beyond his or her authority, or
> under a mistaken interpretation of the law."

Ex parte Butts, 775 So.2d at 177 -78.  It is noteworthy that federal qualified

immunity and Alabama state-agent immunity are not identical.  McCray v. City of

Dothan, 2003 WL 23518420, at *7 (11th Cir. 2003).  Qualified immunity is an

objective standard, while state-agent immunity is a "subjective inquiry into what

the defendant officers actually believed."  Id.  Thus, the court's finding that Cosby

and Johnson were entitled to qualified immunity as to the § 1983 claim does not

"compel the conclusion that the defendants are entitled to Alabama state-function

immunity."  Id.

   Nevertheless, Part 2(d) of the Cranman test appears to shield Cosby and

Johnson.  Plaintiff argues that both exceptions apply in the present matter.  The

first part of this opinion establishes that Cosby and Johnson did not violate the

constitution.  Therefore, the only question remaining is whether Cosby or Johnson

exhibited malice, fraud, bad faith or acted beyond their authority or under a

mistaken interpretation of the law.  A careful scouring of the record reveals that

there is simply no evidence to suggest that either supervisor should not be entitled

to state-agent immunity.

31

## V. CONCLUSION

The court is satisfied that there is no dispute of any material fact and concludes, after resolving all reasonable doubt about the facts in favor of the respective non-movant, and after resolving all justifiable inferences in favor of that non-movant, that plaintiff has failed to point to evidence, or come forward with evidence, sufficient to withstand a motion for judgment as a matter of law as to the claims against Cosby and Johnson. The court finds that no reasonable juror could conclude that Cosby or Johnson acted with deliberate indifference, and as such, they are entitled to qualified immunity on the federal claims. Likewise, Cosby and Johnson are shielded from the state claims by the Alabama state-agent immunity. For these reasons, defendants Cosby and Johnsons' motions for summary judgment are **GRANTED**.

DONE this _1st_ day of February 2005.

SENIOR UNITED STATES DISTRICT JUDGE

32